UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05** CR **1 0 0 2 0**-RCL

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. |
| ) | |
| v. ) | VIOLATIONS: |
| ) | |
| CHARLES J. WALLACE, and ) | 18 U.S.C. §371 (conspiracy to defraud United States |
| DICH TRIEU, ) | and to commit mail fraud) |
| ) | 26 U.S.C. §7203 (willful failure to file tax return) |
| ) | 26 U.S.C. §7203 (willful failure to supply tax |
| defendants. ) | information) |
| ) | 18 U.S.C. §2 (aiding and abetting) |

Information

The United States Attorney Charges that:

ALLEGATIONS COMMON TO ALL COUNTS

1.      At all times pertinent to this Information, Daniel W. McElroy ("McELROY") was

an individual who resided in Sharon in the District of Massachusetts.  At times pertinent to this

Information, McELROY owned and operated corporations through which he conducted a

temporary employment agency business that specialized in providing workers to various

businesses, including manufacturing and food processing concerns.

2.      At all times pertinent to this Information, Aimee J. King McElroy ("KING") was

an individual who resided in Sharon in the District of Massachusetts.  At times pertinent to this

Information, KING was married to McELROY and was a co-owner of corporations through

which McELROY conducted his temporary employment agency business.  At times pertinent to

this Information, KING helped operate the business's main office.

3.      At all times pertinent to this Information, defendant CHARLES J. WALLACE

("WALLACE") was an individual who resided in East Bridgewater in the District of

1

Massachusetts.  At times pertinent to this Information, WALLACE held himself out as a Certified

Public Accounting doing business as Wallace Services.  At times pertinent to this Information,

WALLACE helped operate, and provided various accounting services to, McELROY's

temporary employment agency business.

      4.     At all times pertinent to this Information, defendant DICH TRIEU, was an

individual who residence at Lowell, in the District of Massachusetts.  At times pertinent to this

Information, DICH TRIEU was formally listed as doing business under the name Pro Temp.

Company ("Pro Temp."), although he exercised little or no control over that business entity,

which functioned as an arm of McELROY and KING's temporary employment agency business.

      5.     At all times pertinent to this Information, McELROY operated his temporary

employment agency business under the name of Daily A. King Labor, Inc., a Massachusetts

corporation.  At various times pertinent to this Information, McELROY also operated the

business through, and under the names of, other corporations and individuals, including Pro

Temp. Company ("Pro Temp."), DICH TRIEU, PTC and Precission Temp. Corp ("Precission").

      6.     At times pertinent to this Information, Daily A. King Labor, Inc. maintained

business offices in Taunton, Massachusetts, at 24 Norfolk Avenue, Easton, Massachusetts, and

later at 14 E,G Bristol Drive, Second Floor, South Easton, Massachusetts, with additional offices

in Chelsea, Lowell and New Bedford, Massachusetts.

## TEMPORARY EMPLOYMENT SERVICES (GENERALLY)

7.      The term "temporary employment agency" refers to a business whereby the agency provides client companies with workers, ordinarily on a short-term basis.   Typically, the agency handles the administrative and accounting tasks associated with the hiring and employment process, while the client company directs the day-to-day work activities of the temporary employees.

8.      In temporary employment agency arrangements, the agency is ordinarily responsible for issuing paychecks to the employees, for paying state and federal employment taxes, and for processing payroll deductions for taxes, social security obligations, health care benefits and/or union dues.  The agency is also responsible for meeting certain other fiduciary responsibilities of employers, including maintaining workers compensation insurance for the employees.  For these services, client companies pay fees to the agency.

9.      Fees paid to temporary employment agencies may be calculated in various ways. Commonly, fees are calculated based on a fixed hourly rate.  For example, the agency might charge a client company $10.00 per hour for the services of each temporary employee.  Included in that rate would be the actual wages paid to the worker, additional expenses such as employment taxes, unemployment insurance and workers compensation insurance (sometimes referred to as "fringes"), as well as any profit margin for the temporary employment agency.

## FEDERAL EMPLOYMENT (PAYROLL) TAXES

10.      Federal tax laws require employers, including temporary employment agencies, to file Form 941, Employers Federal Quarterly Tax Return, to report and pay all Federal employment taxes withheld from employees.  Federal employment taxes consist of Social Security

Tax and Medicare Tax.  Employers must file a Form 941 for each quarter ending March 31st;

June 30th; September 30th; and December 31st every year.

11.     Like other employers, temporary employment services are subject to federal

employment taxes.

12.     The Federal Insurance Contributions Act (F.I.C.A.) tax rate is 15.3 % of an

employee's wages.  Each employee is liable for only one half (1/2) of this 15.3%, or 7.65%.

Employers are liable for the other half, or 7.65% of each employees' wages.  Employers are

required by federal tax law to withhold the employees' share of federal employment taxes from

their employees' pay.  Employers are further required to file Form 941 with the IRS in order to

report their payments to employees and to report both the employees' and the employers' share of

federal employment taxes.  At the same time, employers are required to deliver to the IRS the

employee's share of the F.I.C.A. taxes and to pay the employer's share.

13.     Under federal law, employers are also required to withhold taxes from employees'

wages to be credited toward the employees' federal income tax obligations.

THE WORKERS COMPENSATION INSURANCE SYSTEM IN MASSACHUSETTS

14.     At all times pertinent to this Information, the laws of the Commonwealth of

Massachusetts required employers to obtain workers compensation insurance coverage so that

employees who suffer work-related injuries will be compensated in accordance with the workers

compensation laws of Massachusetts.

15.     As with other forms of insurance, employers obtain workers compensation

insurance by paying fees, known as premiums, to insurance companies, which issue insurance

policies that cover the employers' obligations to pay for on-the-job injuries.

4

16.     Commonly, workers compensation insurance is obtained for a fixed period, often one-year, known as the insurance policy term.

17.     As with other forms of insurance, premiums for workers compensation insurance are based in part on factors related to the degree of risk the insurance company is assuming. The following factors commonly are used in calculating a particular employer's workers compensation insurance premium: (1) the total wages of the employees to be covered (known as "payroll"); (2) the nature of the employees' work activities (known as "classification"); and (3) the employer's past history of work-related injuries.

18.     In some cases, insurance companies and employers may agree to a method of pricing workers compensation insurance, known as Retrospective Rating, whereby the insurance premium is determined after the policy term has ended, based in part on the actual losses (i.e. amounts paid to workers injured while working for the employer) during the policy term. When such pricing agreements are in place, the employer's total payroll is commonly used in calculating maximum and minimum premium limits (for example, a Retrospective Rating policy may require an employer to pay a premium of not less than 10% and not more than 200% of a base premium determined by multiplying the employer's payroll by a standard rate, with the final amount of the premium being determined based on actual losses incurred during the policy term).

19.     Ordinarily, at the beginning of a policy term, an employer is required to provide its workers compensation insurance company with estimates of its anticipated payroll during the upcoming policy term, as well as information regarding the job classifications of its employees. These payroll estimates are then commonly used to determine an estimated premium, which the employer may be required to pay, in part or in full, before or during the policy term.

5

20.    After the close of a policy term, the insurance company providing workers compensation insurance commonly conducts an "audit" of the employer's actual payroll during the policy term.  Interim audits may also be conducted, during the policy term, to check the accuracy of the employer's payroll estimates and, if necessary, to adjust the amount of any installment payments the employer may be obligated to pay.  Such audits may be highly informal-- such as obtaining information through a telephone call--or they may involve a more detailed review of records.   During such audits, the employer is required to report to the insurance company its actual payroll during the policy term.  The employer may also be required to furnish records, such as employment tax withholding records, to verify its payroll figures.

21.    Actual payroll figures are used to determine the final amount of the employer's premium for the policy term.  Although the factors used to compute premiums differ for standard and Retrospective Rating arrangements, actual payroll figures are ordinarily required for both kinds of arrangements.

Daily A. King Labor, Inc. Insurance Coverage

22.    Beginning in or about February 1993, McELROY operated Daily A. King Labor, Inc. as a temporary employment agency.

23.    Between in or about February 17, 1993, and in or about July 26, 1996, Daily A. King Labor, Inc. obtained workers compensation insurance policies from Liberty Mutual Insurance Group ("Liberty Mutual").

24.    At times pertinent to this Information, Liberty Mutual maintained a place of business at Boston, in the District of Massachusetts.

25.    At times pertinent to this Information, it was the regular business practice of Liberty Mutual to send various items relating to pricing and billing for insurance policies by the

6

U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

26.     Between in or about July 26, 1996, and in or about July 26, 2000, Daily A. King Labor, Inc. obtained workers compensation insurance coverage through Reliance National Indemnity Company, a Reliance Group Holdings Company ("Reliance").

27.     At times pertinent to this Information, Reliance National Indemnity Company maintained a place of business at 77 Water Street, New York, New York.

28.     At times pertinent to this Information, it was the regular business practice of Reliance to send items relating to pricing and billing for insurance policies by the U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

29.     Between in or about July 26, 1996 and July 26, 2000, the workers compensation insurance agreements between Daily A. King Labor, Inc. and Reliance provided for the use of a retrospective rating plan in pricing the Daily A. King Labor, Inc.'s insurance coverage.  For each of three one-year policy terms, Daily A. King Labor, Inc.'s agreements with Reliance provided for minimum and maximum premiums that were calculated based on multiplying agreed-upon rates times the amount of Daily A. King Labor, Inc.'s payroll during each policy term.

Pro Temp. and Precission Temp. Corp. Insurance Coverage

30.     Beginning in or about 1993 and continuing until on or about June 26, 2001, McELROY, WALLACE and others known to the United States Attorney operated the employment agency, in part, under the names DICH TRIEU, Pro Temp. and Precission Temp. Corp.

7

31.    In or prior to the periods set forth below, McELROY and others caused workers

compensation policies to be obtained in the names of Pro Temp. and DICH TRIEU, from the

following insurance companies:

| Dates of Coverage | Insurance Carrier |
|---|---|
| 9/14/1993  -  9/14/1996 | American Policyholders' Insurance Company |
| 9/14/1996  -  9/14/1997 | Aim Mutual Insurance Company |
| 9/14/1997  -  11/15/1997 | Granite State Insurance Company |
| 11/15/1997 -  11/15/1998 | American Home Assurance Company |
| 1/22/1999  -  1/22/2000 | Reliance National Indemnity Company, |
| 1/22/2000  -  1/22/2001 | Gulf Insurance Company |

32.    In or about May 2000, McELROY and others caused Precission Temp. Corp. to

be added as an additional insured on the insurance policy then in force issued to Pro Temp. by

Gulf Insurance Company.

33.    At times pertinent to this Information, it was the regular business practice of each

of the insurers that provided workers compensation insurance coverage to entities through which

McELROY and WALLACE operated the temporary employment agency business, to send

various items relating to pricing and billing for insurance policies by the U.S. Postal Service,

including notices reflecting interim and final bill amounts and invoices for payment.

## COUNT ONE

### CONSPIRACY (18 U.S.C. §371)

34.    The United States Attorney realleges and incorporates by reference paragraphs 1-32 of this Information, and further charges that:

35.    Beginning some time prior to January 1, 1993 and continuing until on or about June 26, 2001, at Brockton and South Easton in the District of Massachusetts and elsewhere,

### CHARLES J. WALLACE,

defendant herein, together with others known and unknown to the United States Attorney, knowingly and unlawfully conspired and agreed:

> to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, employment and income taxes; and

> to commit offenses against the United States, to wit, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, to place and cause to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

OBJECTIVES OF THE CONSPIRACY

36.     A major purpose and objective of the conspiracy was to enable McELROY to fraudulently avoid paying a portion of the federal employment taxes that were owed in connection with the operation of his temporary employment agency business.

37.     A second major purpose and objective of the conspiracy was to enable McELROY to fraudulently reduce the premiums for workers compensation insurance for his temporary employment agency business.

38.     A further purpose and objective of the conspiracy was to enable McELROY to avoid collecting and paying to the IRS income tax withholding amounts for employees of his temporary employment agency business.

MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspirators accomplished the goals of the conspiracy included, among others, the following:

Off-The-Books Cash Payments to Employees

39.     It was part of the conspiracy that McELROY, WALLACE, KING, DICH TRIEU and others would and did arrange to pay employees of the temporary employment agency business in cash, without keeping appropriate records of the employees' social security numbers and other information necessary for reporting such cash payments to the Internal Revenue Service or to the workers compensation insurers for their business.

40.     It was part of the conspiracy that McELROY, WALLACE and KING administered the office procedures of the temporary employment agency business in such a way that records of cash payments to employees were not maintained in the computerized books and ledgers that were used to record and calculate payroll data for purposes of federal tax reporting and payment.

10

Setting up Separate Business Entities

41.     It was part of the conspiracy that from late-1994 through May 2000, McELROY and WALLACE arranged for an individual, DICH TRIEU, to hold himself out as doing business under the name Pro Temp. Co. for purposes of hiring employees and submitting tax returns, in order to create the appearance that Pro Temp. Co. was a separate and independent business.

42.     It was part of the conspiracy that beginning in or about May 2000, McELROY and WALLACE arranged for an individual known to the United States Attorney to hold himself out as president of Precission Temp. Corp. and arranged for Precission Temp. Corp. to hold itself out as doing business for purposes of hiring employees and submitting tax returns, in order to create the appearance that Precission Temp. Corp. was a separate and independent business.

43.     It was part of the conspiracy that KING would and did instruct employees in the offices of the temporary employment agency business to answer the office telephone "Daily A. King" and to deny knowledge of Pro Temp. Co. and Precission Temp. Corp. KING would and did instruct employees to tell callers who were seeking Pro Temp. Co. and Precission Temp. Corp. that those entities were located at a different address and to provide the callers with a telephone number for those entities.

44.     It was part of the conspiracy that McELROY arranged to obtain a private mailbox at a mailing service in the name of Pro Temp. Co., in order to create the appearance that Pro Temp. Co. maintained a separate business office.

45.     It was part of the conspiracy that McELROY and WALLACE controlled the operations of Pro Temp. Co., which functioned as a part of the temporary employment agency business operated by McELROY and WALLACE.

11

46.     It was part of the conspiracy that McELROY and WALLACE arranged to lease office space in the name of Precission Temp. Corp., in order to create the appearance that Precission Temp. Corp. operated as a separate business.

47.     It was part of the conspiracy that McELROY and WALLACE controlled the operations of Precission Temp. Corp., which functioned as a part of the temporary employment agency business operated by McELROY, WALLACE and KING.

Administering the Cash Payroll

48.     It was part of the conspiracy that McELROY and WALLACE calculated, on a weekly basis, the total amount of cash needed for the off-the-books cash payments to employees of the temporary employment agency business.

49.     It was part of the conspiracy that McELROY, WALLACE, KING, DICH TRIEU and others would and did obtain cash on a weekly basis, in amounts ranging from $200,000 to $300,000 per week, in order to meet the off-the-books payroll of the temporary employment agency business.

50.     It was part of the conspiracy that McELROY, WALLACE, KING, DICH TRIEU and others would and did obtain cash, totaling more than $30,000,000.00 during the years 1997 through the first quarter of 2001 for use in paying the off-the-books payroll of the temporary employment agency business.

51.     It was part of the conspiracy that, at various times, McELROY, WALLACE, KING and others would and did arrange to structure some of their cash transactions to avoid federal Currency Transaction Report filing requirements. That is, they arranged to obtain amounts of cash in excess of $10,000 through multiple transactions, each for less than the $10,000 reporting threshold.

52.    It was part of the conspiracy that McELROY, WALLACE, KING and others would and did cause checks to be written from Daily A. King Labor, Inc. to individuals and entities, including DICH TRIEU, Pro Temp. Co. and Precission Temp. Corp., who in turn, obtained cash to be used to make off-the-books payments to employees of the temporary employment agency business.

53.    It was part of the conspiracy that WALLACE directed and supervised DICH TRIEU and others as they traveled to banks to cash checks and then brought the cash back to the offices of the temporary employment agency business.

Filing False Tax Returns and Willful Failure to File Returns

54.    It was part of the conspiracy that WALLACE would and did prepare and file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc., which returns were false in that they failed to include off-the-books cash payments to employees of the temporary employment agency business.

55.    It was part of the conspiracy that WALLACE would and did prepare and file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Pro Temp. Co., which returns were false in that they failed to include off-the-books cash payments to employees of the temporary employment agency business.

56.    It was part of the conspiracy that McELROY, WALLACE, KING and DICH TRIEU failed to file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for DICH TRIEU and Pro Temp. Company for the calendar quarter ending June 30, 2000, which return was due on July 31, 2000.

57.    It was part of the conspiracy that McELROY, WALLACE, KING and others failed to file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Precission Temp. Corp.

Defrauding Workers Compensation Insurers

58.    The primary means used to defraud workers compensation insurers was to fraudulently understate the payroll of defendants' temporary employment business, thereby directly reducing the insurance premiums, which were calculated on the basis of that payroll.

59.    The payroll of defendants' temporary employment business was fraudulently understated by using made-up payroll figures for Daily A. King Labor, Inc., Precission Temp. Corp. and Pro Temp. Company.

60.    McELROY and WALLACE arranged to and did provide false payroll figures to the insurance companies that provided workers compensation insurance to Daily A. King Labor, Inc., Pro Temp. Company and Precission Temp. Corp.

61.    As part of the scheme to defraud, in order to mislead insurance company auditors, McELROY and WALLACE would and did arrange to provide forged tax forms, which purported to be copies of Form 941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc. and Pro Temp. Co., to the insurance companies that provided workers compensation insurance to those corporations.  These forged tax returns were designed to "verify" the false payroll figures that McELROY and WALLACE had provided to the insurance companies.  The forged tax returns reflected even lower payroll figures than the actual tax returns even though, as noted above, the actual tax returns themselves were fraudulently understated as a result of the failure to report off-the-books cash payroll.

14

62.    For the purpose of executing such scheme and artifice and attempting to do so,

McELROY and WALLACE caused various documents to be sent and delivered by the Postal

Service, to wit: insurance documents that reflected premium calculations based upon false

representations by the defendants regarding the payroll of Daily A. King Labor, Inc.

### OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy, the following individuals did the following:

63.    On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to the following individuals and entities:

| Date | Ck# | Amnt | Payee | Payor | Bank | Acc't # |
|------|-----|------|-------|-------|------|---------|
| 04/28/1997 | 2492 | $4,925 | Dich Trieu | Daily a King Labor Inc | Citizens | 1103097501 |
| 04/29/1997 | 2493 | $4,871 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 04/29/1997 | 2496 | $7,258 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/01/1997 | 2499 | $4,960 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/02/1997 | 5336 | $4,000 | Dich Trieu | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/02/1997 | 5337 | $1,894 | Xieu V. Son | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/05/1997 | 2500 | $4,720 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/06/1997 | 2502 | $4,950 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/07/1997 | 30518 | $6,214 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/07/1997 | 30519 | $3,000 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/13/1997 | 30522 | $6,070 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/14/1997 | 2506 | $4,972 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/15/1997 | 2507 | $4,298 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/15/1997 | 2512 | $4,914 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2508 | $2,983 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2509 | $4,971 | Sotha Khuth | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2511 | $4,984 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 5342 | $3,000 | Dich Trieu | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/16/1997 | 2510 | $4,989 | Hui Ly | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/19/1997 | 2513 | $4,945 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/20/1997 | 2515 | $9,210 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/20/1997 | 30552 | $7,359 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/21/1997 | 2519 | $4,920 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/22/1997 | 2520 | $4,986 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/22/1997 | 2521 | $9,310 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/23/1997 | 2522 | $3,427 | Xieu V. Son | Daily A. King Labor Inc. | Citizens | 1103097501 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 05/23/1997 | 2523 | $3,000 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/23/1997 | 2524 | $7,075 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/27/1997 | 2525 | $9,879 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 2526 | $4,916 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 2527 | $9,810 | Mike Powers | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 30565 | $6,659 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/29/1997 | 2528 | $9,794 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |

64.    On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to Pro Temp. Co.:

| Date | Ck# | Amount | Payor | Payee | Bank | Acc't# |
|---|---|---|---|---|---|---|
| 06/27/97 | 2554 | $30,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 09/26/97 | 3095 | $65,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 04/24/98 | 3141 | $28,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 12/11/98 | 3244 | $65,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 02/05/99 | 3279 | $70,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 02/05/99 | 3280 | $10,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 10/22/99 | 3342 | $70,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |

65.    On or about the following dates, WALLACE prepared checks, drawn on an

account of Pro Temp. Co., payable to DICH TRIEU:

| Date | Ck# | Amnt | Payor | Payee | Bank | Acc't# |
|---|---|---|---|---|---|---|
| 06/30/97 | 2249 | $ 9,876 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 06/30/97 | 2250 | $ 9,906 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 09/26/97 | 2541 | $65,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/21/98 | 2983 | $70,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/22/98 | 7323 | $20,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 12/11/98 | 3652 | $100,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 02/05/99 | 3773 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 10/22/99 | 4797 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |

66.    On or about the following dates, DICH TRIEU cashed the following checks:

| Date | Ck# | Amnt | Payor | Payee | Bank | Acc't# |
|------|-----|------|-------|-------|------|--------|
| 06/30/97 | 2249 | $ 9,876 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 06/30/97 | 2250 | $ 9,906 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 09/26/97 | 2541 | $65,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/21/98 | 2983 | $70,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/22/98 | 7323 | $20,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 12/11/98 | 3652 | $100,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 02/05/99 | 3773 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 10/22/99 | 4797 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |

67.    On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to Precission Temp. Corp.:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 09/13/00 | 13354 | $150,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 11/02/00 | 1032 | $60,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 01/11/01 | 1051 | $50,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 01/25/01 | 1057 | $75,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |

68.    On or about the following dates, WALLACE prepared checks, drawn on accounts

of Precission Temp. Corp.:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 09/14/00 | 1197 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 09/15/00 | 1201 | $100,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/01/00 | 1319 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/03/00 | None | $93,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/11/01 | 1511 | $40,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/12/01 | 1530 | $72,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/26/01 | 1562 | $105,000 | Xieu Van Son | Eastern | 9417782133 |

69.    On or about the following dates, McELROY and WALLACE caused an individual known to the United States Attorney to cash the following checks:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 09/14/00 | 1197 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 09/15/00 | 1201 | $100,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/01/00 | 1319 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/03/00 | None | $93,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/11/01 | 1511 | $40,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/12/01 | 1530 | $72,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/26/01 | 1562 | $105,000 | Xieu Van Son | Eastern | 9417782133 |

70.    On or about the following dates, McELROY, WALLACE, KING, DICH TRIEU and others caused the temporary employment agency business operated by McELROY to pay approximately the following amounts in off-the-books cash payroll to employees of that business, which amounts were not reported in the tax returns of any of the business entities associated with the temporary employment agency business:

| QUARTERLY PAYROLL PERIOD END DATE | OFF-THE-BOOKS CASH PAYROLL |
|-----------------------------------|----------------------------|
| 3/31/97 | $ 336,497.00 |
| 6/30/97 | $ 1,096,791.00 |
| 9/30/97 | $ 1,691,192.00 |
| 12/31/97 | $ 2,275,805.00 |
| 3/31/98 | $ 1,417,507.00 |
| 6/30/98 | $ 1,943,000.00 |
| 9/30/98 | $ 2,313,000.00 |
| 12/31/98 | $ 2,969,100.00 |
| 3/31/99 | $ 1,972,000.00 |
| 6/30/99 | $ 2,095,000.00 |
| 9/30/99 | $ 2,383,000.00 |

| QUARTERLY PAYROLL PERIOD END DATE | OFF-THE-BOOKS CASH PAYROLL |
|---|---|
| 12/31/99 | $ 3,732,000.00 |
| 3/31/00 | $ 2,870,623.00 |
| 6/30/00 | $ 3,017,500.00 |
| 9/30/00 | $ 3,097,000.00 |
| 12/31/00 | $ 3,495,000.00 |
| 3/30/01 | $ 2,521,500.00 |

71.    On or about the following dates, WALLACE prepared and caused to be filed employment tax returns, Form 941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc.:

| Form | Period Covered | Date Signed | Wages Reported | Preparer |
|---|---|---|---|---|
| 941 | 1st Quarter 1997 | 04/30/1997 | 2,452,200.96 | C. Wallace |
| 941 | 2d Quarter 1997 | 07/31/1997 | 2,959,760.59 | C. Wallace |
| 941 | 2d Quarter 1998 | 07/15/1998 | 2,744,046.12 | C. Wallace |
| 941 | 3d Quarter 1998 | 10/27/1998 | 2,661,238.95 | C. Wallace |
| 941 | 4th Quarter 1998 | 01/28/1999 | 2,055,938.33 | C. Wallace |
| 941 | 1st Quarter 1999 | 04/28/1999 | 1,344,209.66 | C. Wallace |
| 941 | 2d Quarter 1999 | 07/26/1999 | 1,617,354.38 | C. Wallace |
| 941 | 3d Quarter 1999 | 10/27/1999 | 1,698,328.31 | C. Wallace |
| 941 | 4th Quarter 1999 | 01/30/2000 | 1,579,487.61 | C. Wallace |
| 941 | 1st Quarter 2000 | 04/25/2000 | 1,367,086.59 | C. Wallace |
| 941 | 2d Quarter 2000 | 07/25/2000 | 1,613,437.30 | C. Wallace |
| 941 | 3d Quarter 2000 | 10/30/2000 | 1,568,039.31 | C. Wallace |

72.    On or about the following dates ,WALLACE prepared and caused to be filed employment tax returns, Form 941, Employers Federal Quarterly Tax Return, for Pro Temp. Co.:

| Form | Period Covered | Date Signed | Wages Reported | Preparer |
|---|---|---|---|---|
| 941 | 1st Quarter 1995 | 04/29/1995 | 89,497.97 | C. Wallace |
| 941 | 2d Quarter 1995 | 07/31/1995 | 29,451.04 | C. Wallace |
| 941 | 3d Quarter 1995 | 10/30/1995 | 100,725.20 | C. Wallace |
| 941 | 4th Quarter 1995 | 05/27/1997 | 241,028.15 | C. Wallace |
| 941 | 1st Quarter 1996 | 05/27/1997 | 172,512.24 | C. Wallace |
| 941 | 2d Quarter 1996 | 05/27/1997 | 211,007.65 | C. Wallace |
| 941 | 3d Quarter 1996 | 05/27/1997 | 307,370.63 | C. Wallace |
| 941 | 4th Quarter 1996 | 05/27/1997 | 434,958.80 | C. Wallace |

| Form | Period Covered | Date Signed | Wages Reported | Preparer |
|------|----------------|-------------|----------------|----------|
| 941 | 1st Quarter 1997 | 05/27/1997 | 283,933.21 | C. Wallace |
| 941 | 2d Quarter 1997 | 07/31/1997 | 239,530.94 | C. Wallace |
| 941 | 3d Quarter 1997 | 10/31/1997 | 211,903.31 | C. Wallace |
| 941 | 4th Quarter 1997 | 01/31/1998 | 261,478.50 | C. Wallace |
| 941 | 1st Quarter 1998 | 04/27/1998 | 225,036.55 | C. Wallace |
| 941 | 2d Quarter 1998 | 07/30/1998 | 251,798.95 | C. Wallace |
| 941 | 3d Quarter 1998 | 10/27/1998 | 412,749.63 | C. Wallace |
| 941 | 4th Quarter 1998 | 01/31/1999 | 422,738.23 | C. Wallace |
| 941 | 1st Quarter 1999 | 04/30/1999 | 136,044.10 | C. Wallace |
| 941 | 2d Quarter 1999 | 07/26/1999 | 170,960.18 | C. Wallace |
| 941 | 3d Quarter 1999 | 10/31/1999 | 196,271.63 | C. Wallace |
| 941 | 4th Quarter 1999 | 01/31/2000 | 148,711.04 | C. Wallace |
| 941 | 1st Quarter 2000 | 05/01/2000 | 180,240.05 | C. Wallace |

73.    On various dates between on or about June 4, 1993 and on or about October 4, 1996, McELROY and WALLACE would and did provide false payroll data to Liberty Mutual Insurance Group, intending that such information be used for purposes of determining workers compensation insurance premiums for Daily A. King. Inc.

74.    On or about September 25, 1997, July 13, 1998, March 5, 1999 and October 4, 1999, McELROY and WALLACE would and did provide payroll data to Reliance National Indemnity Company and its representatives, intending that such information be used for purposes of determining workers compensation insurance premiums for Daily A. King. Inc.

75.    On or about the dates set forth below, WALLACE provided to Reliance National Indemnity Company and its representatives documents that purported to be copies of Payroll Tax Withholding Records (IRS Form 941) and other records of Daily A. King Labor, Inc.  Those records appeared to confirm McELROY's and WALLACE's representations regarding the actual payroll of Daily A. King Labor, Inc.  In actuality, as defendant WALLACE well knew, the documents were forgeries which falsely understated the company's actual payroll:

| Audit Date | Policy Term | Payroll Reported to Insurer |
|------------|-------------|------------------------------|
| 9/25/97 | July 26, 1996 - July 25, 1997 | $ 2,800,871 |
| 7/13/98 | July 26, 1996 - July 25, 1997 | $ 2,800,871 |
| 3/5/99 | July 26, 1997 - July 25, 1998 | $ 2,489,873 |
| 10/4/99 | July 26, 1998 - July 25, 1999 | $ 3,160,431 |

76.     On or about January 26, 1999, WALLACE provided to American Home Assurance Company and its representatives documents that purported to be copies of Payroll Tax Withholding Records (IRS Form 941) and other records of Pro Temp. Company. Those records appeared to confirm McELROY's and WALLACE's representations that the payroll of Pro Temp. Company during the policy term November 15, 1997 through November 15, 1998 was $953,580. In actuality, as defendant WALLACE knew, the $953,580 figure falsely understated the company's actual payroll and the supporting documents were forgeries.

All in violation of Title 18, United States Code, Section 371.

21

COUNT TWO

WILLFUL FAILURE TO KEEP TAX RECORDS AND TO SUPPLY TAX INFORMATION

(26 U.S.C. §7203)

77.    The United States Attorney realleges and incorporates by reference paragraphs 1-13, 36, 38-57 and 63-72 of this Information, and further charges that:

78.    At all times pertinent to this Information, the temporary employment agency business operated under the names Daily A. King Labor, Inc., Pro Temp. Company, Dich Trieu, PTC and Precission Temp. Corp, was required by law to keep records of payments to employees, together with identifying information for those employees, to supply that information to the Internal Revenue Service and, after the close of each calendar quarter and on or before the last day of the month following each calendar quarter, to make an Employer's Quarterly Federal Tax Return, Form 941, to the Director, Internal Revenue Service or other proper office of the United States.

79.    Beginning in or about 1994 and continuing until on or about June 26, 2001, DICH TRIEU, in his capacity as an employee of the temporary employment agency business operated under the names Daily A. King Labor, Inc., Pro Temp. Company, Dich Trieu, PTC and Precission Temp. Corp, arranged to employ, and to pay cash to, multiple individuals without maintaining records of those individuals' social security numbers and other identifying information, which information DICH TRIEU well knew was required for purposes of supplying information to United States tax authorities.

80.    Beginning in or about 1994 and continuing until on or about June 26, 2001, at South Easton and Lowell, in the District of Massachusetts and elsewhere,

DICH TRIEU,

defendant herein, acting on behalf of an employer of labor that was required by law to keep records of payments to individual employees, together with records of those individuals' social security numbers and other identifying information, and to supply such information to the Internal Revenue Service of the United States, did willfully fail to keep such records and did willfully fail to supply such information, at the time or times required by law and regulation.

All in violation of Title 26, United States Code, Section 7203 and Title 18, United States Code, Section 2.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  January 26, 2005

By: _____
PAUL G. LEVENSON
SETH P. BERMAN
Assistant U.S. Attorneys
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

24

05 CR 10020 RCL

**%JS 45  (5/97) - (Revised USAO MA 3/25/02)**

## Criminal Case Cover Sheet                    U.S. District Court - District of Massachusetts

**Place of Offense:**                      Category No. __III__      Investigating Agency __IRS, FBI__

**City**   __South Easton__                **Related Case Information**

**County**   __Bristol__                   Superseding Ind./ Inf. _____ Case No. _____
                                           Same Defendant _____ New Defendant _____
                                           Magistrate Judge Case Number _____
                                           Search Warrant Case Number   __2001 M 0455 RBC__
                                           R 20/R 40 from District of _____

FILED
IN CLERKS OFFICE
2005 JAN 26  P 2: 18
U.S. DISTRICT COURT
DISTRICT OF MASS.

**Defendant Information:**

**Defendant Name**   __CHARLES J. WALLACE__          Juvenile   ☐ Yes   ☒ No

**Alias Name**   _____

**Address**   __253 Harvard Street, East Bridgewater, Massachusetts 02333__

**Birth date:** __**/*/1950__   **SS#:** __***/**/2028__   **Sex:** __M__   **Race:** __White__   **Nationality:** __US__

**Defense Counsel if known:**   __Gregory G. Nazarian, Esq.__      Address:  __1063 N. Main Street__
                                                                            __Brockton, MA 02301__
**Bar Number:**   _____

**U.S. Attorney Information:**

**AUSA**   __Paul G. Levenson__                **Bar Number if applicable**   __553946__

**Interpreter:**   ☐ Yes   ☒ No          **List language and/or dialect:** _____

**Matter to be SEALED:**   ☐ Yes   ☒ No

        ☐ **Warrant Requested**          ☒ **Regular Process**          ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as of** _____ in _____ .
☐ **Already in State Custody** _____   ☐ **Serving Sentence**   ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   **Ordered by** _____ on _____

**Charging Document:**   ☐ **Complaint**      ☒ **Information**      ☐ **Indictment**

**Total # of Counts:**   ☐ **Petty** _____   ☐ **Misdemeanor** _____   ☒ **Felony** __1__

**Continue on Page 2 for Entry of U.S.C. Citations**

☒      I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
       accurately set forth above.

**Date:**  January 26, 2005          **Signature of AUSA:** _____

05 CR 10020 RCL

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant    CHARLES J. WALLACE** _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   18 U.S.C. §371 | Conspiracy | 1 |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

js-45 Wallace.wpd - 3/13/02

✎JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

Place of Offense:                  Category No. __III__          Investigating Agency __IRS, FBI__

City __South Easton__          **Related Case Information:**

County __Bristol__          Superseding Ind./ Inf. _____     Case No. _____
                              Same Defendant _____     New Defendant _____
                              Magistrate Judge Case Number _____
                              Search Warrant Case Number __2001 M 0455 RBC__
                              R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __DICH TRIEU__                    Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address __Utica, New York__

Birth date: __**/*/1948__   SS#: __***/**/9504__   Sex: __M__   Race: __Asian__      Nationality: __Cambodian__

Defense Counsel if known:    John F. Palmer, Esq.        Address: __24 School Street__
                                                                  __Boston, MA 02108__
Bar Number: _____

**U.S. Attorney Information:**

AUSA    __Paul G. Levenson__                    Bar Number if applicable    __553946__

Interpreter:   ☒ Yes   ☐ No          List language and/or dialect:      __Cambodian (Khmer)__

Matter to be SEALED:   ☐ Yes   ☒ No

          ☐ Warrant Requested          ☒ Regular Process          ☐ In Custody

Location Status:

Arrest Date: _____

☐ Already in Federal Custody as of _____   in _____ .
☐ Already in State Custody _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____   on _____

Charging Document:     ☐ Complaint     ☒ Information     ☐ Indictment

Total # of Counts:     ☐ Petty     ☒ Misdemeanor  __1__     ☐ Felony _____

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
      accurately set forth above.

Date:   January 26, 2005          Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse   05 CR 10020 RCL

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**   **DICH TRIEU** _____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| **Set 1** | 26 U.S.C. §7203 | Willful Failure to Supply Tax Information | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

js-45 Trieu.wpd - 3/13/02